## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Craig Steinley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cv-5367 |
| | ) | |
| Appraisal Institute, Cynthia Chance, | ) | |
| James Park, and Denise Graves, | ) | |
| Paula Konikoff, Sandra Adomatis, and | ) | |
| Collateral Risk Network, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Plaintiff Craig Steinley ("Plaintiff" and/or "Steinley"), by and through his attorneys,

Frankin, Greenswag, Channon & Capilla, LLC, and for his Complaint against Defendants

Appraisal Institute ("AI"), Cynthia Chance ("Chance"), James Park ("Park"), Denise Graves

("Graves"), Paula Konikoff ("Konikoff"), Sandra Adomatis ("Adomatis"), and Collateral Risk

Network, Inc. ("CRN") hereby alleges as follows:

### PARTIES

1.     Plaintiff is a citizen of the State of South Dakota.

2.     Defendant AI is an Illinois-not-for-profit corporation with its principal place of business

at 200 West Madison, Suite 2000, Chicago, Illinois 60606.

3.     Defendant Chance is a citizen of the District of Columbia.

4.     Defendant Park is a citizen of the State of Colorado.

5.     Defendant Graves is a citizen of the State of Florida.

6.     Defendant Konikoff is a citizen of the State of California.

7.     Defendant Adomatis is a citizen of the State of Florida.

1

8. Defendant CRN is a Florida nonprofit organization with its principal place of business located at 700 Coconut Ave, Unit 455, Sarasota, Florida 34236.

## JURISDICTION AND VENUE

9. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000 and the parties are citizens of different states.

10. Venue in this District is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred in this District.

## STATEMENT OF FACTS

11. In or around 2012, Steinley joined AI.

12. In or around 2012, Plaintiff was elected as a Chapter Leader.

13. Over a period of years, Steinley was elected to and held multiple national leadership roles within the organization, including Third Regional Director, Region Vice Chair and Director, Region Chair and Director, Vice President, President Elect, President, Immediate Past President, positions on several national committees including the Audit Committee Chair, and more.

## PLAINTIFF'S OBJECTIONS TO AI'S REPORTING OF MEMBERS

14. As the 2019 Audit Committee Chair, Steinley objected to the Appraisal Institute's reporting of 18,000 'members' in the draft copy of its 2018 Form 990 to be filed with the IRS.

15. Steinley had a reasonable suspicion that the number was inaccurate.

16. Steinley followed established AI policy to object based on a reasonable suspicion that the number was inaccurate, however, was overridden by the CEO and Executive Committee.

2

17. Despite the Plaintiff's repeated objections, the practice of misreporting membership numbers continued in subsequent years through 2025, when the 990 filed for 2024 with the IRS by AI stated that the organization had 16,000 'members.'

18. On or about May 10, 2024, at the Q2 Board Meeting, ADQC Chair Ryan Hlubb presented an "ADQC Update" to the directors. He noted that during the preceding eleven-year period, staff had identified at least 1,908 members that were deceased. However, senior staff leadership continued to report them in the membership count as 'active designated members' in IRS filings and public-facing statements. Hlubb also reported that AI had 2,352 non-practicing retired members that paid no dues but were instead still counted as active members.

19. On or about February 10, 2026, AI reported in a public presentation that the number of Retired Designated Members was reduced from over 2,500 to around 400 members. The presentation stated "[a]pproximately 2,000 declined or did not respond and were removed from the 2025 membership roster when offered a transition to a $50 annual fee." However, since 2013 the staff leaders knew that these individuals would not respond, and could not respond, because they had previously been identified by the staff as deceased. This public presentation also noted the number of designated members was around 8,600, of which only about 7,300 classified themselves as practicing full-time appraisers.

20. At a public meeting of the Appraisal Institute on April 13, 2026, Mike Mignogna ("Mignogna"), as President, continued the misrepresentation by displaying a PowerPoint slide that explained the approximately 2,000 retired Designated Members had "exited after declining the $50 transition fee - a policy decision, not organic attrition". However, staff had previously reported that most of these individuals were deceased.

## PLAINTIFF'S EFFORTS TO RELEASE THE APPRAISAL INSTITUE FILES

21.     As the 2019 Audit Committee Chair, Steinley finally confirmed the existence of the Appraisal Institute Files. This collection of past investigations, settlements, disciplinary actions, and non-disclosure agreements covering the actions of bad actors inside the organization for decades was held in the Office of the General Counsel.

22.     Plaintiff consistently sought the release of the Appraisal Institute Files to the Board so it could consider and implement corrective actions system-wide to prevent future reoccurrences.

23.     While serving on the Audit Committee prior to 2019, Plaintiff was told that the Appraisal Institute Files were only available to the Audit Committee Chair.

24.     Once Plaintiff was elected to the Audit Committee Chair position, he was told that the legal guidance had changed and the Appraisal Institute Files were only available to the Executive Committee.

25.     In or about January 2021, when Plaintiff was elected to the Executive Committee, he was told by the Office of the General Counsel that the Appraisal Institute Files were only available to the President.

26.     In or about January 2023, when Plaintiff became the President, new guidance from the Office of the General Counsel was that only the Executive Committee by majority motion could release the Appraisal Institute Files to the Board, a move which Konikoff and Adomatis, as voting officers, repeatedly blocked.

## AI'S DISPARATE TREATMENT

27.     As the 2019 Audit Committee Chair and continuing during his time as an officer, Plaintiff repeatedly observed disparate treatment in the final dispositions of complaints

4

against members that were investigated by the Audit Committee. The outcome routinely depended upon their ties to leadership.

28. In or around early 2019, the Audit Committee investigated the actions of a male designated member after receiving multiple complaints from females about his conduct while instructing classes for the organization.

29. Eighteen witness interviews were conducted in this matter, totaling over 700 minutes.

30. Over 400 pages of documents were reviewed by the committee, whereupon it was discovered that this individual had been the subject of at least one prior Audit Committee investigation.

31. Once the 2019 investigation was completed, Steinley, as Chair, readied for presentation to the Board the Audit Committee's complete findings and recommendations for discipline, as was typical and in alignment with the organization's policies and procedures.

32. However, given these individuals' ties to some in leadership at the time, the Executive Committee acted in advance of and instead of the Board of Directors to adjudicate this matter and impose less severe sanctions than those recommended by the Audit Committee.

33. Despite Plaintiff's objections and contrary to past precedent, the Board was not made aware of the early 2019 complaints, the Audit Committee's investigation, or its findings and recommendations in this matter. Nor was the Board provided with the opportunity to amend or ratify the findings of the Audit Committee in this investigation.

34. All the interview notes, evidence, transcripts, and supporting documentation received by the Audit Committee resulting from the complaints from females about this male member

were relinquished to the Office of the General Counsel, as ordered by the Executive Committee, to be held in the Appraisal Institute Files collection.

**PLAINTIFF'S RETALIATORY REMOVAL FROM THE AUDIT COMMITTEE**

35. On or about July 25, 2019, at the Q3 Board of Directors Meeting in Denver, CO, Plaintiff was elected by the Board to his third 2-year term on the Audit Committee for continued service in 2020 and 2021. The results of the Audit Committee election were widely disseminated by AI to members and outside stakeholders in press releases and website entries.

36. In or around the fall of 2019, Plaintiff was then reelected by the members of the Audit Committee at its in-person meeting to continue as its 2020 Chair. Plaintiff told President Stephen Wagner ("Wagner") during a call ahead of that Audit Committee in-person meeting that he would continue his efforts in the new term on the Audit Committee to provide the Board of Directors with access to the contents of the Appraisal Institute Files.

37. Unbeknownst to Steinley, Wagner and the Executive Committee then commenced an action to invalidate the prior Board election of July 2019 and remove Steinley from the Audit Committee.

38. At the Q4 Board Meeting in Chicago on or about November 15, 2019, and without proper notice to Plaintiff, Wagner planned for a non-agenda item during the meeting, a vote of the Board to remove Plaintiff from the Audit Committee as of December 31, 2019. Outside counsel John Wintrol was flown in from DC for an in-person presentation. He told the Board that even though the Bylaws did not specifically call for a two-term term-limit for the Audit Committee under "Committees of the Board" in Article XI, Part B, he intended for that to be the case when he drafted the Bylaws. Further, Wintrol told the

6

Board members that voting against his advice as legal counsel would likely invalidate their individual Directors' liability coverage and guarantee of indemnity provided by the AI and could make them personally liable for the costs of any subsequent legal action in this matter.

39. In or around early November 2019, Mignogna, the 2026 President but then as an Audit Committee and Board member, posted on the Board's messaging system – Communities of Practice ("COP") that "[w]hile some might say there is ambiguity in the Bylaws, I am inclined to disagree. As Director Lynch noted, Article XI, Part A, Section 2 addresses two-term term limits for National Committees, but the Audit Committee is discussed in Part B of Article XI, not Part A. Moreover, Regulation 7 deals with all of the National Committees, and yet Audit is not one of the committees mentioned in the Reg. Audit's composition and duties are specifically enumerated in Article XI, Part B, Section 2. If the Bylaws allow Board members to serve more than two terms, it follows that a Committee of the Board can be populated similarly."

40. Steinley's attorneys studied the Bylaws concerning the Audit Committee ahead of the July 2019 Q3 Board meeting and agreed with Mignogna. Further, the Board had voted in July 2019 with full knowledge that they were electing Plaintiff to a third 2-year term on the Audit Committee.

41. Plaintiff was not given adequate notice of the Executive Committee's decision to call for a vote to remove him from the Audit Committee at the Board of Directors Meeting on or about November 15, 2019. He was also denied the fundamental due process protections of notice of the proceedings against him, an opportunity to be heard, and the ability to have counsel present. Because of this retaliatory action, Steinley could not provide an

adequate impromptu layperson's defense to Wintrol's legal advice. In a split vote, and with strong backing from the Executive Committee, the Board removed Plaintiff from the Audit Committee at the end of his second 2-year term on December 31, 2019, and invalidated its own prior certified election of July 25, 2019.

42. On or around December 30, 2022, the Chair of the Audit Committee provided a written report to the Executive Committee about the behavior of an incoming Third Director, a male, on or about November 11, 2022.

43. Multiple written and telephoned complaints were received from Board members and incoming Third Directors by the Audit Committee between November 11, 2022, through December 19, 2022.

44. The complaints alleged inappropriate and repeated physical contact toward an incoming female Third Director that evening and repeated use of the "N" word by the male in a public hotel bar where the Board of Directors were provided lodging during the Board meeting.

45. Despite AI protocol requiring the disclosure to the Board of Directors of these complaints to the Audit Committee, the results of its investigation, and its recommendations in the matter, the President and Audit Committee Chair intervened to adjudicate the matter.

46. Despite Plaintiff's objections, the full details about this November 2022 Audit Committee matter were not provided to the Board of Directors and the documentation was instead sent by the Executive Committee to the Appraisal Institute Files in the Office of the General Counsel.

47. At the time Konikoff and Adomatis acted to remove Plaintiff from the Board of Directors in May 2025, both were aware that Steinley had authored a Board motion for future

action to finally compel the release of the Appraisal Institute Files to the individual Board members.

## PLAINTIFF'S OBJECTIONS TO AUDIT COMMITTEE'S LACK OF TRANSPARENCY

48. During Plaintiff's four years of elected service on the Audit Committee, its quarterly reports to the Board of Directors routinely included a list of the new contract(s) awarded to board members and officers, as well as the reason for the contract(s), the amount of the contract(s), and the duration of the contract(s). This served as a check and balance on contracts granted by staff to the organization's elected board members, officers, and national committee members ("insiders").

49. This practice continued during Plaintiff's service as 2019 Audit Committee Chair when he consistently provided these reports with full details about contracts to insiders at the Board of Directors meetings.

50. Beginning in or around 2024 during Adomatis' presidency, the Audit Committee stopped reporting to the Board of Directors the amount of the AI contract(s) awarded to insiders. The practice of removing the financial details from the Audit Committee's report to the Board continued in 2025 during Konikoff's presidency.

51. Konikoff and Adomatis were awarded frequent contracts by the organization's staff during their service as officers, typically for education development and delivery, both in-person and asynchronous.

52. In 2024 and 2025, Steinley repeatedly objected during meetings of the Executive Committee to the decision of the Audit Committee to no longer disclose the details of the organization's insider contracts to the Board. However, his efforts to return to the past

9

policy of transparently reporting those details to the Board were consistently blocked in the Executive Committee by Adomatis and Konikoff as voting officers.

53. In or around the Spring of 2025, Steinley asked for a meeting with the Audit Committee. Audit Committee Chair Mike Tankersley ("Tankersley") arranged the meeting, at which Plaintiff asked the Audit Committee to voluntarily return to the long-standing practice of transparently reporting all the details, including financial particulars, about insider contracts to the Board of Directors.

54. After the meeting with the Audit Committee, Tankersley and Audit Committee Vice Chair Richard Wolf ("Wolf") relayed to Steinley that the Audit Committee under their leadership had reaffirmed its decision to keep the financial details about insider contracts from the Board of Directors. When Plaintiff asked why, Tankersley responded that he didn't want to stifle competition among instructors and developers. This was a non sequitur as the contracts were primarily awarded by staff to members in favor and without a competitive bid process.

55. At the time Konikoff and Adomatis acted to remove Plaintiff from the Board of Directors in May 2025, both were aware, along with Tankersley and Wolf, that Steinley had authored a Board motion for future action to compel the Audit Committee to transparently report all the details, including the financial particulars, about insider contracts to the Board of Directors.

**PLAINTIFF'S EFFORTS TO EXPOSE INTERNATIONAL TRAVEL JUNKETS**

56. In the early 2000's, the Appraisal Institute had around 100 international members. At the end of 2025, AI had 96 designated international members, of which 81 were practicing and therefore paying dues.

57. In between, hundreds of thousands of member dollars were spent on officer travel for international appraiser conferences, gatherings, and education. For example, the average annual expense for reimbursed international travel was $279,000 between 2012 and 2016.

58. Knowing that the member money was better spent domestically, Plaintiff was a strong opponent of AI reimbursement for international travel and worked with other board members while in leadership to successfully create policies and protocols that discouraged international travel reimbursements. The exception was for the delivery of AI education in an international location that resulted in a net surplus after paying all expenses, including travel reimbursement.

59. During his more than a decade of service on the national Board of Directors, Plaintiff never traveled internationally at AI expense.

60. In or around late 2024, Steinley was told by a staff member that Konikoff and Adomatis had traveled at AI expense on multiple occasions to countries beyond the US and Canada and the trips did not align with the exception in policy for education delivery with a positive net surplus.

61. In or around early 2025, Plaintiff, as Vice President, asked a staff member for detailed records regarding any and all expenses for international travel paid by AI in the post-pandemic period. Konikoff, as President, was made aware of this request by the CEO and staff and together with Adomatis repeatedly tried to block the release to Plaintiff. After weeks, the Office of the General Counsel agreed that Steinley was entitled to the information. The data showed AI-reimbursed trips to Europe by Konikoff and repeated AI-reimbursed trips to Latin America by Adomatis.

62. At the time Konikoff and Adomatis acted to remove Plaintiff from the Board of Directors in May 2025, both were aware that Steinley had prepared a report to be provided to the Board of Directors regarding their reimbursement for international travel that appeared to be outside of the Board's agreed protocols and policies.

**SELF INTEREST INSTEAD OF EDUCATION MODERNIZATION**

63. In or about late 2022, while preparing for his service as 2023 President, Steinley met with the leaders of the 2023 Education Committee to charge them with thoughtfully implementing one of the major planks in AI's Strategic Plan – "Modernize AI's Education Delivery System and Products".

64. During the first six months of 2023, the Education Committee met approximately two dozen times and interviewed dozens of users, developers, instructors, and other stakeholders involved with AI's education efforts. The committee also collected national education market share data from state appraiser regulatory bodies across the US.

65. Using a weighted average capture rate analysis, the 2023 Education Committee reported to the Board of Directors that AI's capture rate for continuing education seminars ("CE") had fallen from 16% in 2018 to 11.1% at the end of 2022. During the same period, the same state appraiser regulatory body data showed that AI's qualifying education ("QE") market share had fallen from 14% to 6%.

66. Because of the dramatic decrease in market share and its charge from AI's Strategic Plan, the Education Committee spent hundreds of hours producing comprehensive recommendations to the Board in the first six months of 2023. The Committee also built a sophisticated model of appraiser CE and QE classes across the US to provide positive proof of their concepts for the Board of Directors. The 2023 Education Committee's Plan

("2023 Education Modernization Plan") would have modernized AI's education products and delivery system and radically altered business as usual. At Steinley's direction as President, the Education Committee presented their market share findings and the evolving 2023 Education Modernization Plan at the Quarter 2, Quarter 3, and Quarter 4 Board meetings in 2023.

67. At a Special Board Meeting on or about December 14, 2023, the Board passed a motion directing the Finance Committee to complete a financial analysis of the 2023 Education Modernization Plan and directing the CEO to prepare a draft implementation plan for the 2023 Education Modernization Plan. Both tasks were to be completed by the Q1 2024 Board of Directors Meeting.

68. In or around November 2023, Adomatis appointed Past President Sara Stephens ("Stephens") and Past President Jody Bishop ("Bishop"), both antagonists of the Plaintiff, to the Finance Committee, each with a two-year term beginning January 1, 2024.

69. Given their gravitas as Past Presidents, Stephens and Bishop were successful in convincing the Finance Committee to delay its required financial analysis of the 2023 Education Modernization Plan for most of 2024. At the same time, Adomatis, as 2024 President, and Konikoff, as 2025 President, refused to bring the 2023 Education Modernization Plan back to the floor for further action by the Board of Directors, despite the timeline in the motion about the 2023 Education Modernization Plan that was passed by the Board in December 2023.

70. The resistance to the 2023 Education Modernization Plan came primarily from the organization's entrenched and long-standing developers and instructors like Konikoff and Adomatis. The 2023 Education Modernization Plan would have allowed designated

13

members that had long sought to become approved AI developers and instructors, some having waited and been shut out for many years by the existing processes, to be equally considered for these assignments.

71. The 2023 Education Modernization Plan to reverse the market share loss in AI education also encouraged development and teaching opportunities to be offered to a broader pool of newer and younger AI instructors and education developers.

72. By their actions, Adomatis and Konikoff were successful in foreclosing the opportunity for the Board to consider and implement the 2023 Education Modernization Plan and thereby preserved their existing and future AI contracts for education delivery and development. They were also successful in sabotaging the Plaintiff's repeated and persistent efforts to open AI education delivery and development to a wider and younger group of members.

**PLAINTIFF'S MULTIPLE ELECTIONS TO EXECUTIVE LEADERSHIP**

73. By their actions, Adomatis and Konikoff also allowed the downward spiral in AI's education market share to continue. Using the same state appraiser regulatory body data, AI's CE market share had fallen into the single-digit range, and its QE market share was less than 5%, both analyzed in early 2025.

74. Steinley served as 2023 President of the Appraisal Institute after serving as the 2021 Vice President and 2022 President Elect.

75. In 2024, Steinley was again elected to the role of Vice President of AI, with the term to begin in 2025 and which would again cycle through as the 2026 President Elect, 2027 President, and 2028 Immediate Past President roles in successive years.

14

76.    Each instance of Plaintiff's being elected Vice President of AI involved being fully vetted by background check and selected by AI's National Nominating Committee.

77.    No background check ever raised any concerns about Mr. Steinley's candidacy for the roles.

78.    In early 2022, while still serving as President Elect, outside counsel for AI, Paula Goedert, called Steinley to tell him to never be alone in an office with Beata Swacha, the then Chief Financial Officer of AI.

79.    This was the first time Steinley ever became aware of any concerns regarding Ms. Swacha, with whom he had barely any interaction.

80.    In or around September 2022, outside counsel for AI, Norma Zeitler called Steinley to convey that AI had received a complaint about him and after further investigation they would not be moving forward with any action.

81.    Zeitler warned Steinley against using the AI office for hoteling or working between official meetings and to instead use his hotel room for work. Plaintiff therefore considered the AI office to be a very hostile work environment.

82.    Steinley ascended to the role of 2023 President of AI on January 1, 2023.

**PLAINTIFF'S ACTIONS TO INCREASE TRANSPARENCY**

83.    During his Presidency, Steinley expanded the use of livestream camera feeds for gavel-to-gavel public access into the 2023 quarterly AI Board meetings.

84.    While President, AI members and the public enjoyed the longest possible full livestream access to the 2-day quarterly Board meetings and the most limited use of executive sessions (which required the temporary cessation of the livestream feed).

15

85. Once Adomatis became President on January 1, 2024, she unilaterally discontinued the availability of public livestream access to the quarterly Board meetings. Adomatis instead instituted a 'Board Meeting Recap' webinar, which occurs days after each quarterly Board meeting ends.

86. During these recap webinars, the AI officers tell the public what they want them to know about the business conducted during the Board meeting on a 'trust me' basis.

87. Plaintiff repeatedly objected throughout 2024 and requested that Adomatis return to the livestream feeds of Board meetings that occurred in 2021, 2022, and during his Presidency in 2023.

88. However, such action was consistently blocked in the Executive Committee by Adomatis and Konikoff as voting officers.

**PLAINTIFF'S OBJECTIONS AND EFFORTS TO END AI PAREA**

89. In early 2023, while serving his term as President of AI, Steinley amplified his efforts to expose the Appraisal Institute's Practical Applications of Real Estate Appraisal ("AI PAREA") program's mounting financial losses and other serious concerns.

90. Both Konikoff and Adomatis, as the principal decision maker for AI PAREA, opposed the release of financial performance data about the program, which effectively blocked such action by the Executive Committee.

91. The Plaintiff repeatedly called for a transparent report to membership that outlined the vastly overstated revenue and understated expense forecasts made by Adomatis and staff leaders to convince the Board to continue with AI PAREA, the lack of protections for AI's intellectual property in the contract with the AI PAREA technology vendor; Adomatis' awarding of a sole-source contract for the residential appraiser software used

16

by AI PAREA students to an insider and without a competitive bidding process; the hardcoding of AI PAREA to the legacy residential appraisal form known as URAR 2.6 and not to the new residential appraisal report form known as URAR 3.6; and the lack of conversion of AI PAREA graduates to long-term members in the organization.

92. Steinley aggressively sought an up or down vote from the members and/or the Board of Directors to terminate AI PAREA after these facts were publicly available but was consistently opposed by Konikoff and Adomatis.

93. In September of 2023, Ms. Chance was hired as CEO of AI.

94. Shortly thereafter, she fired Beata Swacha who had returned to her former position as CFO.

95. On or about September 27, 2023, and after her termination, Beata Swacha filed a lawsuit in the Circuit Court of Cook County (Case No. 2025L006066) against AI and Steinley.

96. On or about October 22, 2023, Chance wrote about AI PAREA "The numbers just don't work out. And you can't make revenue assumptions when you don't know how many participants per instructor. This isn't difficult to figure out. It's more like back of the envelope stuff."

97. On or about December 14, 2023, at a Special Board Meeting, Chance stated that the faulty modeling of AI PAREA revenue and expenses required the recently passed 2024 budget to be reforecast.

98. Chance noted that AI PAREA's revenue in the 2024 budget was overstated by $1.0 million and expenses for AI PAREA's mentors and overhead were significantly understated.

99. Chance also represented on this date that AI's 2023 operating loss would be $369,000.

17

100. Steinley completed his term as AI President on December 31, 2023, and transitioned to the role of Immediate Past President in 2024.

101. The Appraisal Institute's 990 filed with the IRS reported an actual operating loss in 2023 of nearly $1.1 million.

102. On or about February 23, 2024, outside counsel Tom Luetkemeyer provided the AI Board of Directors with a verbal report of his findings in thoroughly investigating the allegations against Plaintiff made by Swacha. He reported that no other employees had ever filed internal or external complaints against Steinley and he could not corroborate any of the allegations made by Swacha.

103. On or about April 13, 2024, Chance texted Plaintiff about the Swacha accusations: "[h]onestly when I stepped back from it and tried to look at it like a lawyer, my best guess would be that the two of you had a relationship and she felt scorned. And I know that isn't true. I made a point of noting the clear animosity. But that would have been my theory. I'm telling you what it looked like from the outside, I tried to correct that. I could see you hated each other. It wasn't a sexual thing. It was hating."

104. On or about April 17, 2024, Luetkemeyer presented the results of his investigation of Swacha's claims in a letter to the mediator for an upcoming mediation between the parties. A copy of the Luetkemeyer letter was also provided to Chance, Konikoff, Adomatis, Mignogna, and Acting CEO John Udelhofen ("Udelhofen").

105. On or about May 2, 2024, the case filed by Beata Swacha against AI and Steinley was dismissed pursuant to a settlement.

106. Chance, as CEO of AI, was the sole decision maker and authorized signer for the settlement, on behalf of AI, with Ms. Swacha.

18

107. Chance was the only representative of AI at the Swacha mediation on or about May 2, 2024, except for legal counsel.

108. Chance worked closely with outside counsel defending the claim, had knowledge of the facts and circumstances surrounding the claim, and provided strong support for her belief that Steinley did not engage in inappropriate conduct regarding Swacha.

109. After the completion of the Swacha settlement, and with full knowledge of the situation and yet another thorough vetting as a candidate, Steinley was selected again by AI's National Nominating Committee in May 2024 to serve in the elected officer roles beginning with returning to the Vice President role in 2025.

110. Plaintiff's nomination as 2025 Vice President was again subsequently ratified by the full Board of Directors in August 2024.

111. On or about August 15, 2024, through August 16, 2024, AI's Quarter 3 Board Meeting was held in Minneapolis.

112. One of the main actions taken by the Board at the Quarter 3 Board Meeting was to address the negative reports concerning Ms. Chance's performance.

113. Outside counsel Becky Kalas had previously itemized the problems with Chance's performance in writing. The issues she wrote about included:

    a. Insubordination, including attempting to subvert the authority of the Board of Directors and the Executive Committee many times. Such authority was evident in the AI's Bylaws, other governing documents, the AI's policies and procedures, and Chance's Employment Agreement, among other places.

    b. Contracting issues, including disregarding requirements under AI's contract approval policy, signing several contracts outside of the contract management

system and without legal review, failure to obtain competitive bids, potential back dating of contracts, and failure to obtain approval from the Executive Committee or Board of Directors for contracts above certain established monetary thresholds.

c. Personnel issues. In total, Chance presided over the termination of 27 employees, out of 96 when she began. During this period, 42 total individuals left the AI, some without providing any notice. By the end of Chance's tenure, AI experienced the highest rate of turnover in recent memory. During 2024, turnover was 53.2%; Chance was terminated in September 2024, or it might have been higher. This is in sharp contrast to turnover of 13.1% in 2023 and 13.6% in 2022.

d. Potential violations of post-employment obligations, which survived the termination of her employment. These included the non-solicitation, non-competition, and non-disparagement clauses of her Employment Agreement.

e. Financial performance. Although Chance represented her efforts as resulting in a "turnaround" for AI during her tenure, the organization had its worst financial performance in 15 years. The Appraisal Institute's 990 filed with the IRS ultimately reported an operating loss in 2024 of nearly $2.4 million.

114. On or about September 12, 2024, Chance was terminated from AI on the vote of the full Board of Directors.

115. Sometime in late 2024, Chance first notified AI that she would pursue claims of harassment, retaliation against Steinley, and negligent supervision, negligent retention, negligent hiring, defamation per se, Illinois Whistleblower Act, retaliation, and sexual harassment against AI.

116. The Plaintiff was not made aware of the Chance claims and correspondence until sometime in January 2025 and was not provided copies of Chance's documents for months after that.

117. However, upon receipt of the Chance claims and correspondence from her attorney, Konikoff and Adomatis were immediately provided copies by AI's Office of the General Counsel.

118. Again, counsel for AI investigated the claims made by Chance and determined that there was no merit to them.

119. On or about February 19, 2025, during Steinley's interview about the allegations made by Chance, outside counsel Becky Kalas stated that she was 95-97% finished with her investigation and had found nothing to support Chance's claims against him.

120. Chance's allegations of harassment and retaliation against Plaintiff are false.

121. On or about October 7, 2023, Chance texted Steinley: "I'm really glad to be working with you, and glad we're becoming friends, which I'm sure we will be for a long time".

122. On or about October 21, 2023, Chance began texting Steinley suggestive selfies, photos from her childhood, photos of her children, and photos of her residence in DC, among others.

123. Between August 15, 2023, and May 22, 2024 (just over nine months), Chance and Plaintiff exchanged an average of approximately 25 texts per day, seven days a week. The topics included AI business matters, contemporaneous commentary about a meeting they were both attending, travel plans, personal matters such as family and friends, life experiences, personal time together, Chance's frustration with staff and other officers, etc. Instead of being harassed, she was friendly, aggressive, and pursued Steinley.

124. On or about December 17, 2023, on an AI business trip attended by Chance, Adomatis, and Steinley in Puerto Rico, Chance texted Steinley for his hotel room number at about 2 am before an early morning flight back to the mainland. She then texted "Let me come say goodbye to you", which she did.

125. On or about December 18, 2023, Chance texted Plaintiff: "I miss you... I don't want you to know, but I told you anyway."

126. On or about December 20, 2023, Chance texted Plaintiff: "Everyone admires you very much. I admire you too. You know I do... more than you know. I'd crawl through gravel for you. You may have noticed at a few meetings. My dad calls the woman who runs his memory care 'boss lady'. You know you're my boss."

127. On or about December 22, 2023, Chance signed an email to Steinley: "Your ride or die, Cindy".

128. On or about February 19, 2024, while Plaintiff was in Chicago for the upcoming Quarter 1 Board of Directors meeting, Chance invited him to her recently acquired home in downtown Chicago for a private one-on-one dinner. Chance texted Steinley the address and met him in the lobby to escort him past building security to her residence. Later that evening after Steinley had returned to his hotel, Chance texted: "It was lovely to see you".

129. During the spring of 2024, Steinley became convinced that Chance should work much closer with Adomatis, as President, and reduce her reliance on him for guidance on AI matters. For example, in late 2023 Chance texted Steinley: "I'm truly said about Sandy... such a hard pill to swallow after how much fun it was working with you. And how much you always had my back."

130. On or about April 13, 2024, Chance's actions were becoming more concerning to Plaintiff. On that day, she texted Steinley: "Here's the thing – we may already know each other too well or too long as friends – real friends – for this to be anything else. There's just another level to those things and if I'm confused about how you feel, then we don't have that."

131. On or about April 22, 2024, through April 23, 2024, Chance, Adomatis, and Plaintiff attended an appraiser conference in Colorado Springs, CO, on behalf of AI. Based on difficult interactions at the conference, Steinley determined that it was time to further separate from Chance.

132. On or about April 23, 2024, Steinley texted Chance "[i]t's best we don't talk for a while". Chance's reactions via persistent unanswered phone calls and her texts over the next ten hours made Steinley uncomfortable. Thereafter, though their professional interactions continued, primarily at virtual meetings of various AI committees or the Board, Steinley and Chance did not talk or text again privately for nearly a month, and then only minimally after that through the summer of 2024.

133. For months after receipt of Chance's claims of harassment sometime in late 2024, AI counsel deprived Steinley of the defense and indemnification owed to him pursuant to organizational bylaws.

134. Throughout 2024, Adomatis, as President, repeatedly reduced or declined Plaintiff's reimbursement for travel expenses for AI business in 2024 forcing him to pay those costs out-of-pocket.

135. On or about October 22, 2024, Udelhofen retaliated against Plaintiff in the Akins termination and lawsuit matter when he told Akins that she was correct in assuming

Steinley cancelled her trip to an upcoming work-related conference and the cancellation was punitive. Udelhofen knew that the approval (or denial) of all AI-related travel in 2024 was solely the decision of Adomatis, as President, and that he and Adomatis had cancelled Akin's upcoming trip without a courtesy notification to Akins.

136.    On or about October 30, 2024, Udelhofen retaliated against Plaintiff in the Akins termination and lawsuit matter. To justify his upcoming action to terminate Akins, he texted her in response to her question about being fired: "No. I'm trying to help you get out with some runway. My feeling is that Craig [Steinley] will make it hell for you as long as you stay."

137.    In the beginning of 2025, Paula Konikoff, as the new President, stopped allowing Plaintiff to speak to members of AI at in-person or virtual chapter or regional events as representative of AI, despite his role as Vice President of the organization and that he was frequently invited to present by these regional and local groups.

138.    In early January 2025, Konikoff emailed various Appraisal Institute chapters and regions and unilaterally cancelled Steinley's long-planned commitments to travel in 2025 to events and meetings at which Steinley had been requested. Plaintiff suffered unreimbursed cancellation expenses related to travel, lodging, and opportunity costs due to Konikoff's actions.

139.    On or about January 14, 2025, Konikoff unilaterally removed Steinley from the Executive Committee rotation of officers attending virtual and in-person organizational events.

140.    Despite multiple, repeated, and consistent requests from Steinley for Adomatis, as President, and Udelhofen, as Acting CEO, to release the written Luetkemeyer

24

investigation report of April 17, 2024 about the Swacha matter to the Board members in 2024, and to Konikoff, as President, and Udelhofen in 2025, the three of them banded together to prevent the release of the Luetkemeyer document that exonerated Steinley to the Board of Directors.

141. On or about March 13, 2025, Ms. Chance filed charges of sexual harassment and retaliation with the Illinois Department of Human Rights ("IDHR") against Plaintiff.

142. On or about March 28, 2025, Ms. Chance requested to opt out of the IDHR investigation.

143. On or about May 8, 2025, Ms. Chance filed a lawsuit against Plaintiff and AI in the Circuit Court of Cook County, Illinois (Case No. 2025L006066).

144. On or about May 8, 2025, the same day Chance filed her lawsuit against Plaintiff, a New York Times Article, *Widely Inappropriate Behavior': Real Estate Group is Accused of Cover-ups* ("May 8, 2025, NYT Article"), written by Debra Kamin was published.

145. In the May 8, 2025, NYT Article, Chance made statements claiming Plaintiff sexually harassed her.

146. In the May 8, 2025, NYT Article, James Park was quoted, stating "[i]t was one of the things that is just accepted in the industry, that that's the way he is."

147. In the May 8, 2025, NYT Article, Denise Graves, was quoted stating "[w]e all had a nickname for him: Mr. Handsy."

148. On or about May 9, 2025, Konikoff, as President, told Steinley he must step away from public appearances.

149. On or about May 12, 2025, a New York Times published an article, *V.P. of Real Estate Group Will Step Away After Harassment Claims.*

25

150. On or about May 14, 2025, Crain's Chicago Business published an article, *Troubles mount at Appraisal Institute, Chicago-based center of property valuations.*

151. From approximately May 14, 2025, to May 16, 2025, Steinley was prevented by Konikoff, as President, from attending the Appraisal Institute's annual Leadership Development and Advisory Council (LDAC) Meeting in Washington DC.

152. Upon information and belief, Konikoff and Adomatis stated to other member-leaders present at LDAC that other women were coming forward against Steinley, that Steinley was present and involved in the settlement of the Swacha case, and that AI leadership "needed help" to get "rid" of Plaintiff.

153. Konikoff and Adomatis also openly urged attendees to contact their Regional Chairs and Vice Chairs to support a motion to remove Steinley from leadership while in various general and breakout sessions at LDAC.

154. Upon information and belief, Konikoff openly solicited the necessary Board member interest via its COP to schedule a Special Board Meeting with an unknown purpose.

155. On or about May 15, 2025, the directors of AI were notified of a Special Board Meeting to be held on May 21, 2025. The bylaws requirements concerning the specific disclosure of the purpose of a Special Board Meeting were ignored by Konikoff.

156. On or about May 17, 2025, Mignogna called Steinley after returning home from LDAC. He relayed that when the LDAC meetings started on May 14, 2025, it was clear that the mob mentality of the attendees was laser focused on the removal of all four elected officers. Mignogna indicated that by the end of LDAC, Konikoff and Adomatis had successfully turned that hostility towards removing Steinley as the 2025 Vice President instead. He apologized as he felt the other officers were now safe at Steinley's expense.

26

157. Steinley was not given adequate notice of the Special Board of Directors Meeting to be held on May 21, 2025.

158. Plaintiff was also denied the fundamental due process protections of notice of the proceedings against him, an opportunity to be heard, and the ability to have counsel present.

159. On or about May 20, 2025, Konikoff, as AI's President, emailed Plaintiff in the late evening suggesting a motion would be presented the following day that would involve his removal.

160. On or about May 21, 2025, Plaintiff was removed from AI's Board of Directors on a motion made by Mario Caro, seconded by Tina O'Connell.

161. On or about May 22, 2025, a message from the President of AI announcing Plaintiff's removal from the Board of Directors was featured on the homepage of the AI's website.

162. On or about June 4, 2025, Ms. Chance filed Partial Voluntary Dismissal to remove Steinley from the Cook County lawsuit.

163. On or about June 10, 2025, Crain's Chicago Business published an article, *Ex-CEO of Appraisal Institute drops sexual harassment claims against former VP* (the "June 10, 2025, Crain's Article").

164. The June 10, 2025, Crain's Article states "[i]n the June 4 motion for voluntary dismissal, Chance's attorney, Thalia Pacheco of Chicago Firm Workplace Law Partners, provides no reason for withdrawing the claims."

165. Since Plaintiff's removal from AI's Board of Directors on May 21, 2025, Plaintiff no longer receives training or is invited to quarterly meetings provided for AI-approved

27

appraisal instructors and is no longer a hirable AI-approved instructor at the Chapter level, despite never being formally notified.

166. Since Plaintiff's removal from AI's Board of Directors on May 21, 2025, the formal acknowledgement of Plaintiff's $1,500 AI political action committee ("AI PAC") donation, an amount which he repeated donated for several legislative cycles, was removed from the AI website. However, the $1,500 AI PAC donation was never returned to the Plaintiff.

167. At a public meeting of the Appraisal Institute on April 13, 2026, Mignogna, as President, addressed the topic of "Deficit Trajectory Worsening" with a PowerPoint slide displaying an operating loss for the organization in 2025 of nearly $2.0 million and serious drawdowns to cover cumulative yearly operating losses that were eroding assets and reserves. He also subsequently revealed that the AI's 2026 operating loss was projected at that time to be as much as $3.0 million.

## COUNT I – DEFAMATION
### (Against the Appraisal Institute, Paula Konikoff, and Sandra Adomatis)

168. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

169. At all relevant times, Defendants Konikoff and Adomatis were officers, directors, agents, employees, and/or authorized representatives of Defendant AI and were acting within the scope of their actual and/or apparent authority on behalf of AI.

170. Beginning in or about late 2024 and continuing through at least May 2025, AI, by and through its officers and agents including Konikoff and Adomatis, published and republished false statements concerning Plaintiff that accused or implied that Plaintiff

28

engaged in sexual harassment, inappropriate conduct toward women, and other misconduct incompatible with his leadership and professional roles.

171. The statements made by AI, through Konikoff and Adomatis and other agents, were false.

172. Prior to the publication and republication of the defamatory statements, AI possessed substantial information demonstrating that allegations against Plaintiff were unsubstantiated.

173. On or about February 23, 2024, outside counsel, Tom Luetkemeyer ("Luetkemeyer") verbally reported to the AI Board of Directors that he could not corroborate allegations made against Plaintiff by Swacha and that no other employees had filed internal or external complaints against him.

174. On or about April 17, 2024, Luetkemeyer further presented the results of his investigation in writing to the mediator in the Swacha matter, with copies provided to Chance, Konikoff, Adomatis, Mignogna, and Udelhofen.

175. On or about February 19, 2025, during the later investigation into Chance's allegation, outside counsel, Becky Kalas informed Plaintiff that she was "95-97% finished" with her investigation and had found nothing to support Chance's claims against him.

176. Despite possessing information demonstrating that the allegation against Plaintiff lacked substantiation, AI, through Konikoff and Adomatis and other agents, continued to publish and republish statements implying that Plaintiff engaged in sexual harassment or other improper conduct.

177. Upon information and belief, during the Appraisal Institute's LDAC meetings in May 2025, Konikoff and Adomatis told AI members and leaders that additional women were

29

"coming forward" against Plaintiff, that Plaintiff had been involved in the settlement of the Swacha matter, and that AI leadership "needed help" to get "rid" of the Plaintiff.

178. Upon information and belief, Konikoff and Adomatis further encouraged AI members and leadership attendees to support efforts to remove Plaintiff from leadership based upon the foregoing accusations and implications.

179. The statements made by AI, through its officers and agents, including Konikoff and Adomatis, conveyed to listeners and readers that Plaintiff engaged in sexual misconduct, harassment, or other improper conduct toward women and was unfit to serve in leadership positions within the organization.

180. The defamatory statements were communicated to third parties, including members of AI, Board members, regional and chapter leadership, chapter executive directors, and individuals attending LDAC and related organizational meetings and events.

181. Upon information and belief, officers, directors, members, agents, and/or representatives of AI provided statements, comments, background information, and accusations concerning Plaintiff in the May 8, 2025, NYT Article.

182. The May 8, 2025, NYT Article included statements accusing or implying that Plaintiff engaged in sexual harassment, inappropriate touching, improper conduct toward women, and other misconduct that interfered with his professional roles.

183. Upon information and belief, officers, directors, members, agents, and/or representatives of AI also communicated with Crain's Chicago Business and other media outlets regarding Plaintiff and supplied statements or information portraying Plaintiff as having engaged in misconduct.

184. On or about May 22, 2025, AI published on its website an announcement regarding Plaintiff's removal from the Board of Directors which, in context and under the surrounding circumstances, reinforced and republished the false implication that Plaintiff had engaged in serious misconduct warranting removal.

185. AI further adopted and ratified the foregoing defamatory statements by removing Plaintiff from leadership, prohibiting his public appearances, stripping him of instructor opportunities, and failing to correct known false statements made by agents of AI.

186. The foregoing statements and implications were false.

187. Plaintiff did not engage in sexual harassment, habitual unwanted touching, or the misconduct attributed or implied by Defendant and those acting on its behalf.

188. AI knew the statements were false, lacked any reliable basis to believe them true, or acted with reckless disregard as to their truth or falsity.

189. AI further acted with improper motive, including but not limited to internal political purposes, retaliation, reputational self-protection, and removal of Plaintiff from leadership.

190. The statements were communicated to third parties and widely disseminated through national and regional media outlets and AI's own publications.

191. As a direct and proximate result of AI's defamatory conduct, Plaintiff suffered damages including, but not limited to:

    a. Damage to his personal and professional reputation;

    b. Removal from leadership positions,

    c. Loss of professional opportunities and speaking engagements;

    d. Humiliation, embarrassment, and emotional distress;

e. Economic damages; and

f. Other consequential damages to be proven at trial.

192. AI, through its officers and agents, acted intentionally, maliciously, and with reckless disregard for the truth or falsity of the statements concerning Plaintiff.

193. The conduct of Konikoff and Adomatis is attributable to AI, as agents of AI making statements within the scope of their employment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Appraisal Institute, Paula Konikoff, and Sandra Adomatis and award Plaintiff compensatory damages in an amount to be determined at trial; punitive damages; attorney's fees; and such other relied as this Court deems just and proper.

## COUNT II – DEFAMATION
### (Against Cynthia Chance)

194. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

195. Beginning in or around late 2024 and continuing through at least May 2025, Defendant Chance made and published false statements concerning Plaintiff accusing or implying that Plaintiff engaged in sexual harassment and other inappropriate conduct toward women.

196. The statements made by Chance were false.

197. Prior to making the defamatory statements, Chance knew that Plaintiff had not engaged in the misconduct she later alleged.

198. Chance maintained an extensive and voluntary personal and professional relationship with Plaintiff throughout 2023 and much of 2024.

32

199. Between approximately August 2023 and May 2024, Plaintiff and Chance exchanged frequent personal and professional communications, including numerous friendly and affectionate messages initiated by Chance.

200. On or about October 7, 2023, Chance texted Plaintiff: "I'm really glad to be working with you, and glad we're becoming friends, which I'm sure we will be for a long time."

201. On or about December 18, 2023, Chance texted Plaintiff: "I miss you… I don't want you to know, but I told you anyway."

202. On or about December 20, 2023, Chance texted Plaintiff: "Everyone admires you very much. I admire you too. You know I do…more than you know. I'd crawl through gravel for you. My dad calls the woman who runs his memory care 'boss lady'. You know you're my boss".

203. On or about December 22, 2023, Chance signed an email to Plaintiff: "Your ride or die, Cindy."

204. On or about February 19, 2024, Chance invited Plaintiff to her private residence in downtown Chicago for a one-on-one dinner.

205. On or about April 13, 2024, Chance texted Plaintiff: "Here's the thing – we may already know each other too well or too long as friends – real friends – for this to be anything else."

206. On or about April 23, 2024, Plaintiff informed Chance that "[i]t's best we don't talk for a while," after which their private communications substantially diminished.

207. Despite the foregoing history and despite knowing that Plaintiff had not sexually harassed her, Chance subsequently made accusations of sexual harassment and retaliation against Plaintiff.

33

208. On or about March 13, 2025, Chance filed charges against Plaintiff with the Illinois Department of Human Rights alleging sexual harassment and retaliation.

209. On or about May 8, 2025, Chance filed a lawsuit against Plaintiff in the Circuit Court of Cook County alleging sexual harassment and related misconduct.

210. On the same date, May 8, 2025, Chance caused statements accusing Plaintiff of sexual harassment to be published in the New York Times article, *Widely Inappropriate Behavior': Real Estate Group is Accused of Cover-ups.*

211. The statements made and published by Chance in the May 8, 2025, NYT Article, conveyed to readers and third parties that Plaintiff engaged in sexual harassment and improper conduct toward women.

212. The statements by Chance constitute defamation per se because they falsely imputed a lack of integrity in the discharge of Plaintiff's professional duties; an inability to perform his professional and leadership roles; and sexual misconduct and behavior incompatible with Plaintiff's profession.

213. The defamatory statements were communicated to third parties, including but not limited to AI leadership, AI members, the media, professional colleagues, and the public.

214. Upon information and belief, Chance made the statements maliciously, intentionally, and with reckless disregard for the truth or falsity.

215. On or about June 4, 2025, Chance voluntarily dismissed Plaintiff from the Cook County lawsuit.

216. As a direct and proximate result of Chance's defamatory conduct, Plaintiff suffered damages including, but not limited to:

    a. Damage of his personal and professional reputation;

34

    b.   Removal from leadership positions;

    c.   Loss of professional opportunities and speaking engagements;

    d.   Humiliation, embarrassment, and emotional distress;

    e.   Economic damages; and

    f.   Other consequential damages to be proven at trial.

217. Chance's conduct was willful, wanton, malicious, and demonstrated a reckless disregard for Plaintiff's rights.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Cynthia Chance and award compensatory damages, attorneys' fees, punitive damages, and such other and further relief as the Court deems just and proper.

## COUNT III – DEFAMATION
### (Against James Park and Collateral Risk Network, Inc.)

218. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

219. At all relevant times, Defendant Park as the President of Defendant CRN and acted as an officer, agent, employe, representative, and/or apparent agent of CRN.

220. Park was widely recognized within the appraisal industry as the President of CRN and a representative of that organization.

221. As a result of Park's position and prominence within the industry, third parties reasonably understood his public statements concerning Plaintiff to be made on behalf of, endorsed by, and/or carrying the authority of CRN.

222. On or about May 8, 2025, Park made statements concerning Plaintiff that were published in a New York Times article titled *Widely Inappropriate Behavior': Real Estate Group is Accused of Cover-ups.*

35

223. In the article, Park was quoted stating: "[i]t was one of the things that is just accepted in the industry, that that's the way he is."

224. The statement by Park conveyed to readers that Plaintiff routinely engaged in inappropriate sexual conduct and harassment toward women and that such behavior was commonly known with the appraisal industry.

225. The statement was false.

226. Park knew the statement was false or acted with reckless disregard for its truth or falsity.

227. Prior to the publication of the statement, investigations conducted by outside counsel concerning allegations against Plaintiff failed to corroborate claims of misconduct.

228. The defamatory statement was communicated to third parties, including members of the appraisal industry, professional colleagues, AI members, clients, media readers, and the public.

229. Upon information and belief, CRN ratified, adopted, endorsed, and/or failed to repudiate Park's defamatory statements made in his capacity as President of CRN.

230. Park's conduct and statements undertaken within the scope of his actual and/or apparent authority as President of CRN.

231. As a direct and proximate result of Defendant's defamatory conduct, Plaintiff suffered damages including, but not limited to:

    a. Damage to his personal and professional reputation;

    b. Loss of professional opportunities;

    c. Humiliation, embarrassment, and emotional distress;

    d. Economic damages; and

    e. Other consequential damages to be proven at trial.

232. Park acted intentionally, maliciously, and with reckless disregard for Plaintiff's rights.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants James Park and Collateral Risk Network, Inc. and award compensatory damages, attorneys' fees, punitive damages, and such other and further relief as the Court deems just and proper.

## COUNT IV – DEFAMATION
### (Against Denise Graves)

233. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

234. On or about May 8, 2025, Defendant Graves made statements concerning Plaintiff that were published in a New York Times articled titled *Widely Inappropriate Behavior': Real Estate Group is Accused of Cover-ups.*

235. In the article, Graves was quoted stating: "[w]e all had a nickname for him: Mr. Handsy."

236. The statement by Graves conveyed to readers that Plaintiff routinely engaged in inappropriate physical touching, sexual misconduct, and/or harassment toward women.

237. The statement was false.

238. Graves knew the statement was false or acted with reckless disregard for its truth or falsity.

239. Prior to publication of the statement, investigations conducted by outside counsel concerning allegations against Plaintiff failed to corroborate claims or misconduct.

240. The defamatory statement was communicated to third parties, including members of the appraisal industry, professional colleagues, AI members, clients, media, and readers.

241. The statement caused Plaintiff substantial injury to his reputation personally and professionally.

242. As a direct and proximate result of Graves' defamatory conduct, Plaintiff suffered damages including, but not limited to:

    a. Damage to his personal and professional reputation;

    b. Loss of leadership and professional opportunities;

    c. Humiliation, embarrassment, and emotional distress;

    d. Economic damages; and

    e. Other consequential damages to be proven at trial.

243. Graves acted intentionally, maliciously, and with reckless disregard for the truth or falsity of the statement concerning the Plaintiff.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Denise Graves and award compensatory damages, attorneys' fees, punitive damages, and such other and further relief as the Court deems just and proper.

## COUNT V – RETALIATORY DISCHARGE
### (Against the Appraisal Institute)

244. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

245. Plaintiff repeatedly engaged in activities intended to expose misconduct, financial irregularities, governance failures, and unethical conduct within AI.

246. Plaintiff objected to AI's reporting of inaccurate membership figures in IRS filings and public-facing statements, including counting of deceased individuals and non-practicing members as active members.

247. Plaintiff repeatedly sought transparency concerning the Appraisal Institute Files, including past investigations, settlements, disciplinary actions, and nondisclosure agreements maintained by AI's office of the General Counsel.

248. Plaintiff repeatedly objected to disparate treatment in the handling of complaints and disciplinary matters within AI and advocated for proper disclosure and oversight by the Board of Directors.

249. Plaintiff further raised concerns regarding AI PAREA, including financial misrepresentations, understated expenses, overstated revenue projections, lack of competitive bidding, and governance failures.

250. Plaintiff repeatedly sought transparency in AI governance, including livestream public access to Board meetings and disclosure of organizational financial and operational concerns to membership.

251. Plaintiff's conduct was undertaken in good faith and in furtherance of important public policies favoring transparency, accountability, accurate reporting, and the reporting of potential misconduct within nonprofit organizations.

252. AI, through officers and agents, were aware of Plaintiff's objections, disclosures, and advocacy efforts.

253. At the time AI and its leadership initiated actions against Plaintiff in 2025, Konikoff and Adomatis were aware that Plaintiff had authored and sought support for a Board motion for future action to compel release of the Appraisal Institute Files to the Board of Directors.

254. Beginning in 2024 and escalating in 2025, AI, through its officers and agents, engaged in a campaign in retaliation against Plaintiff because of their disagreement with Plaintiff's initiatives and opposition to organizational misconduct.

255. Among other retaliatory acts, AI:

    a. Restricted Plaintiff's participation in AI events and leadership functions;

    b. Reduced or denied reimbursement of Plaintiff's business expenses;

c.  Removed Plaintiff from Executive committee event rotations;

d.  Cancelled Plaintiff's scheduled appearances and travel commitments;

e.  Prevented Plaintiff from attending LDAC in May 2025;

f.  Publicly isolated and discredited Plaintiff within the organization;

g.  Solicited support for Plaintiff's removal from leadership and board members; and

h.  Ultimately removed Plaintiff from AI's Board of Directors on or about May 21, 2025.

256.  Plaintiff's removal from leadership and the Board of Directors constituted a termination or discharge from his elected leadership roles, professional functions, and associated organizational privileges within AI.

257.  AI's stated and implied reasons for removing Plaintiff were pretextual and were used to silence, punish, and discredit Plaintiff because of his protected conduct.

258.  As a direct and proximate result of AI's retaliatory conduct, Plaintiff suffered damages including, but not limited to:

a.  Damage to his personal and professional reputation;

b.  Loss of leadership and professional opportunities;

c.  Humiliation, embarrassment, and emotional distress;

d.  Economic damages; and

e.  Other consequential damages to be proven at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Appraisal Institute and award Plaintiff compensatory damages in an amount to be determined at trial; punitive damages; attorney's fees; and such other relied as this Court deems just and proper.

## COUNT VI – VIOLATION OF ILLINOIS WHISTLEBLOWER ACT
### (Against AI)

259. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

260. At all relevant times, Plaintiff was an officer, elected leader, representative, and/or employee within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/1 et seq.

261. AI was an employer within the meaning of the Illinois Whistleblower Act.

262. Plaintiff disclosed, attempted to disclose, objected to, and refused to participate in activities that he reasonably believed violated state law, federal law, fiduciary obligations, and/or rules governing nonprofit organizations.

263. Plaintiff repeatedly objected to AI's reporting of inaccurate membership figures in IRS filings and public-facing statements, including the counting of deceased individuals and non-practicing members as actives members.

264. Plaintiff reasonably believed that the reporting of false or misleading membership figures in IRS Form 990 filings and related public statements constituted unlawful, fraudulent, and/or improper conduct.

265. Plaintiff repeatedly sought release of the Appraisal Institute Files to the Board of Directors to permit proper oversight and corrective action concerning misconduct within the organization.

266. Plaintiff also advocated for transparency regarding AI PAREA's financial condition, including overstated revenue projections, understated expenses, and lack of competitive bidding.

267. Plaintiff's disclosures, objections, and refusals constituted protected activity under the Illinois Whistleblower Act.

41

268. AI, through its officers and agents, was aware of Plaintiff's protected activities.

269. After and because of Plaintiff's activities, AI retaliated against Plaintiff.

270. The retaliatory actions included, but were not limited to:

   a. Restricting Plaintiff's participation in AI leadership activities;

   b. Cancelling Plaintiff's speaking engagements and travel commitments;

   c. Reducing and denying reimbursement of Plaintiff's organization expenses;

   d. Removing Plaintiff from Executive Committee event rotations;

   e. Excluding Plaintiff from organization events and meetings;

   f. Publicly discrediting Plaintiff within the organization;

   g. Soliciting support for Plaintiff's removal from leadership; and

   h. Removing Plaintiff from the AI Board of Directors on or about May 21, 2025.

271. AI's retaliatory conduct was motivated, at least in part, by Plaintiff's objections to and disclosures concerning organizational misconduct and improper activities.

272. AI's conduct violated Illinois Whistleblower Act by retaliating against Plaintiff for disclosing information to persons with authority over the employer and for refusing to participate in activities Plaintiff reasonably believe to be unlawful.

273. As a direct and proximate result of AI's violations of the Illinois Whistleblower Act, Plaintiff suffered damages including, but not limited to:

   a. Damage to his personal and professional reputation;

   b. Loss of leadership and professional opportunities;

   c. Humiliation, embarrassment, and emotional distress;

   d. Economic damages; and

   e. Other consequential damages to be proven at trial.

42

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Appraisal Institute and award Plaintiff compensatory damages in an amount to be determined at trial; punitive damages; attorney's fees; and such other relied as this Court deems just and proper.

## COUNT VII – VIOLATION OF AI'S WHISTLEBLOWER POLICY
### (Against AI)

274. Plaintiff hereby realleges and incorporates by reference Paragraphs 1 through 167 as if fully set forth herein.

275. At all relevant times, AI maintained written policies and procedures encouraging officers, directors, members, employees, and leadership to report suspected misconduct, unethical behavior, governance failures, financial irregularities, and violations of organizational policies.

276. AI's whistleblower-related policies and procedures represented that individuals who made good-faith complaints or disclosures concerning organizational misconduct would be protected from retaliation and adverse action.

277. AI intended its officers, directors, and leadership, including Plaintiff, to rely upon these policies and protections when reporting concerns regarding organizational misconduct.

278. Plaintiff reasonably relied upon AI's whistleblower protections and policies in repeatedly raising concerns regarding:

   a. Inaccurate IRS and membership reporting;

   b. Alleged suppression of investigations and disciplinary actions;

   c. Governance irregularities and lack of transparency;

   d. Financial and contracting concerns regarding AI PAREA;

   e. Disparate treatment in disciplinary proceedings.

43

279. Plaintiff repeatedly acted in good faith and in furtherance of AI's stated governance and compliance objectives by reporting, objecting to, and seeking corrective action concerning the foregoing matters.

280. AI, through its officers and agents, retaliated against Plaintiff.

281. The retaliatory actions included, but were not limited to:

    a. Restricting Plaintiff's participation in AI leadership activities;

    b. Cancelling Plaintiff's speaking engagements and travel commitments;

    c. Reducing and denying reimbursement of Plaintiff's organization expenses;

    d. Removing Plaintiff from Executive Committee event rotations;

    e. Excluding Plaintiff from organization events and meetings;

    f. Publicly discrediting Plaintiff within the organization;

    g. Soliciting support for Plaintiff's removal from leadership; and

    h. Removing Plaintiff from the AI Board of Directors on or about May 21, 2025.

282. AI's conduct violated its own whistleblower protections and representations made to officers, directors, and leadership participants within AI.

283. AI's whistleblower policies constituted promises upon which Plaintiff reasonably relied upon.

284. As a direct and proximate result of AI's violations of the Illinois Whistleblower Act, Plaintiff suffered damages including, but not limited to:

    a. Damage to his personal and professional reputation;

    b. Loss of leadership and professional opportunities;

    c. Humiliation, embarrassment, and emotional distress;

    d. Economic damages; and

44

e.  Other consequential damages to be proven at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Appraisal Institute and award Plaintiff compensatory damages in an amount to be determined at trial; punitive damages; attorney's fees; and such other relied as this Court deems just and proper.

Respectfully submitted,

Craig Steinley

By: */s/ Alexandra Letto*

Craig Capilla (ARDC #6292509)
Alexandra Letto (ARDC #6353300)
181 Waukegan Road, Suite #205
Northfield, IL 60093
Phone: (847) 701-2250
Fax: (847) 501-5390
ccapilla@fgcclaw.com
aletto@fgcclaw.com

45